IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BOB BRIGHTWELL, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 03-205J |
| vs. | ) | Judge Kim R. Gibson/ |
| | ) | Magistrate Judge Lisa |
| | ) | Pupo Lenihan |
| JOSEPH LEHMAN, RAYMOND SOBINA, | ) | |
| SYLVIA GIBSON, GERALD ROZUM, | ) | |
| DANIEL J. GEHLMANN, LEO GLASS, | ) | |
| JEFFREY BEARD, EDWARD KLEM, KENNETH | ) | |
| CHMIELEWSKI, MARVA CERULLO, | ) | |
| JOSEPH RUSH, and DR. FRED MAUE | ) | |
| | ) | |
| Defendants | ) | Re: Doc. Nos. 46 & 59 |
| | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### RECOMMENDATION

It is recommended that the Defendants' Motions to Dismiss be granted in part and denied in part.  They should be granted as to Plaintiff's procedural due process claims (Count I), his state law contract claim (Count II), his International Treaty claims (Count V) and his Eighth Amendment claim regarding Keri Lotion; the motions to dismiss should be denied as to all other claims, i.e., the remaining Eighth Amendment claims and the First Amendment retaliation claims.

### REPORT

Bob Brightwell ("Plaintiff"), is currently serving a life

sentence for murder.[1]  He alleges a litany of complaints in this civil rights action against his custodians.  There are five counts in Plaintiff's civil rights complaint.  The first count alleges a procedural due process violation in that after completing the Special Management Unit program, he was transferred to SCI-Somerset, but rather than being placed in the general population, the SCI-Somerset Defendants placed him in Administrative Custody status for a period of about ten months, which he claims constituted an atypical and significant hardship that denied him a liberty interest without due process.  In his second count, Plaintiff claims that the Defendants breached a contract with him, contending that the SMU policy constituted a contract which bound the Defendants to release him into general population upon successful completion of the SMU program.  In Count III, Plaintiff claims that the Defendants violated his Eighth Amendment rights in several ways by not properly treating his several medical problems.   In Count IV, Plaintiff claims that the Defendants retaliated against him for writing letters to government officials and filing grievances and instituting this suit.  In Count V, he makes claims under international treaties entered into by the United States.

---

[1]  He is a litigious prisoner, and consequently has accumulated three strikes.  As a result, a report and recommendation was prepared in this case recommending denial of his motion to proceed in forma pauperis.  Doc. 3.  Subsequently, he paid the entire filing fee.

2

A.    **Relevant Procedural History**

Plaintiff's filed his amended complaint which alleged violations of his federal Constitutional rights and a state law contract claim.  Doc. 41.  Attached to that amended complaint were many documents.  The following Department of Corrections ("DOC") Defendants filed a motion to dismiss, Doc. 46 and a brief in support, Doc. 47: Joseph Lehman, Raymond Sobina, Sylvia Gibson, Gerald Rozum, Daniel Gehlman, and Leo Glass.  Although there were other DOC defendants, i.e., Jeffrey Beard, Edward Klem, Kenneth Chmielewski, Marva Cerullo, and Dr. Fred Maue, as they had not been served yet, the motion was not formally filed on their behalf, but the Attorney General's office made clear that the arguments raised on behalf of the DOC defendants who had been served applied equally to those that had not been served. Doc. 47 at 3 n.1.  Thereafter, Defendant Rush, a physician's assistant at SCI-Mahanoy, filed a motion to dismiss, Doc. 59 and a brief in support.  Doc. 60.  Subsequently, Plaintiff filed his brief in opposition, attaching thereto, documents.  Doc. 68.

B.    **Applicable Legal Standards**

In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the complaint must be read in the light most favorable to the plaintiff and all well-pleaded, material allegations of fact in the complaint must, as a general rule, be taken as true. See Estelle v. Gamble, 429 U.S. 97 (1976).  In addition to the

complaint, courts may consider matters of public record and other matters of which a court may take judicial notice, court orders, and exhibits attached to the complaint when disposing of a motion to dismiss under Rule 12(b)(6).  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.2 (3d Cir. 1994); Barber v. Grow, 929 F.Supp. 820, 822 (E.D. Pa. 1996).

Furthermore, because Plaintiff is pro se, courts accord an even more liberal reading of the complaint, employing less stringent standards when considering pro se pleadings than when judging the work product of an attorney.  Haines v. Kerner, 404 U.S. 519 (1972).

Dismissal is proper under Rule 12(b)(6) where the court determines that the facts as alleged by the plaintiff taken as true and viewed in a light most favorable to the plaintiff, fail to state a claim as a matter of law. See, e.g., Gould Electronics, Inc. v. U.S., 220 F.3d 169, 178 (3d Cir. 2000). Although as a general rule, a court must accept the allegations of the complaint as true for purposes of evaluating a Rule 12(b)(6) motion to dismiss, the court need not accept allegations in the complaint as true where they are contradicted by the documents attached to the complaint.  Steckman v. Hart Brewing, 143 F.3d 1293, 1295-96 (9th Cir. 1998)("we are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.");  Rozsa v. May Davis

4

Group, Inc., 187 F.Supp.2d 123, 128-29 (S.D.N.Y. 2002) ("When allegations contained within the complaint are contradicted by documents attached to the complaint, the documents control, and the Court need not accept the allegations contained within the complaint as true.").[2]

## C. Discussion

### 1. Procedural Due Process Claim

In his first count, Plaintiff complains that his procedural due process rights were violated.  Plaintiff had apparently been housed in the Special Management Unit at SCI-Greene.  The SMU is designed for inmates who "are considered to be a continual threat or are disruptive to the orderly running of the facility or who have repeatedly been subject of either disciplinary action or

---

[2]   In addition, because Plaintiff is a prisoner complaining about prison conditions, the screening provisions of 42 U.S.C. § 1997e(c) applies.  In addition, 28 U.S.C. § 1915A's screening provisions apply at least to all the DOC defendants.   In reviewing complaints for failure to state a claim under 42 U.S.C. § 1997e(c) and 28 U.S.C. § 1915A, a federal court applies the same standard applied to motions to dismiss under Fed.R.Civ.P. 12(b)(6). Tucker v. Angelone, 954 F. Supp. 134, 135 (E.D. Va. 1977), aff'd, 116 F.3d 473 (4th Cir. 1997) (Table). Not-withstanding the fact that the Defendants have filed motions to dismiss, the court is not relieved of its obligation to sua sponte dismiss the complaint if the complaint fails to state a claim if the basis for doing so appears to the court even if not raised in the motion to dismiss.  Lopez v. Smith, 203 F.3d 1122, 1126 n.6 (9th Cir. 2000)(en banc).  Hence, if there is a ground for dismissal which was not relied upon by the Defendants in their motions, the court may nonetheless sua sponte rest its dismissal upon such ground pursuant to the screening provisions of the PLRA.  See id.

investigative efforts because of their conduct." Doc. 41, Ex. A. at 3. The SMU is basically a behavior modification program that provides incentives to behave appropriately by rewarding the compliant inmate with ever increasing privileges by passing through successive phases of the program.

Plaintiff claims that upon successful completion of the program, he is entitled to be released into the general population of a prison. Instantly, however, when Plaintiff was transferred from SCI-Greene upon completing the SMU program, to SCI-Somerset on May 27, 2003, rather than being immediately placed in the general population at SCI-Somerset, he was placed in administrative custody ("AC").[3] Upon his arrival as SCI-Somerset, he was interviewed by the Inmate Receiving Committee ("IRC"), Doc. 41, ¶ 31. The IRC recommended that he be placed in AC until he could be interviewed by the Program Review Committee ("PRC").[4] Doc. 41, Ex. E at unn. 2. Plaintiff alleges that on May 29, 2003 he appeared before the PRC and was informed that he would be released to general population by June 4, 2003. Doc. 41,

---

[3] Administrative Custody is a "status of confinement for non-disciplinary reasons which provides closer supervision, control, and protection than is provided for in general population." Doc. 41 Ex. D at unn. 1.

[4] The PRC is a "committee consisting of three (3) staff members that conducts Administrative Custody Hearings, periodic reviews, makes decisions regarding continued confinement in the Restricted Housing Unit (RHU) and/or Special Management Unit..." Doc. 41 Ex. D at unn. 10.

¶ 33. (The Court was unable to locate any supporting documentation for this allegation.) The record before the Court indicates that the PRC determined that Plaintiff should be "continu[ed] in AC status in accordance with DC-ADM 802, Section VI.A.1.i. (No records are available to determine the inmate's custody level.) due to need of review of records." Doc. 41, Ex. E at unn. 3.

The DOC regulations provide that at least once every thirty days, the inmates assigned to AC will have an opportunity to be personally interviewed by the PRC and if the inmate is not released to general population, the PRC will document the reasons why continuation in AC is necessary. Doc. 41, Ex. C at unn. 4. Plaintiff had the opportunity to attend these periodic reviews on June 17, and August 14, 2003 but Plaintiff refused to do so. Doc. 41, Ex. E at unn. 8. Plaintiff argued that he refused to attend the June 17, 2003 PRC review because it was perfunctory and because he had been lied to about when he would get out of AC. Doc. 41, Ex. E at unn. 5-6.

Plaintiff remained in AC status from May 27, 2003 until January 27, 2004 when he was transferred back to SCI-Greene. Doc. 41, at ¶ 40. Plaintiff appealed his status and in response to his final appeal, his continued placement in AC was explained to him by Robert Bitner, the Chief Hearing Examiner:

> [a]s documented by the Program Review Committee and
> explained by Superintendent Sobina, you have been

> placed in A.C. status pursuant to DC ADM 801, VI A, 1a,
> as you are seen as a threat to others in the medium
> security environment due to you extensive history in
> the Department of Corrections.  Your refusal to see the
> Program Review Committee to discuss your case only
> further delays their ability to work with you to
> establish a viable treatment plan for you.

Doc. 41, Ex. E at unn. 7.  The Court takes judicial notice of the

fact that SCI-Somerset is a medium security institution.[5]

Upon his arrival at SCI-Greene he was maintained in AC until

March 25, 2004 when he was released into general population.[6]

Plaintiff alleges that his continued confinement in the AC

deprived him of his procedural due process rights.

Conducting a procedural due process analysis involves a two

step inquiry: the first question to be asked is whether the

complaining party has a protected liberty interest within the

contemplation of the Due Process clause and, if so, the second

question to be asked is whether the process afforded the

complaining party comported with constitutional requirements.

Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).  A liberty

interest can arise in one of two ways: 1) it can be derived

directly from the Due Process clause of the Federal Constitution

---

[5]   http://www.cor.state.pa.us/somerset/site/default.asp

(site last visited November 30, 2005).  The DOC website
describes SCI-Somerset as a "medium-security facility."

[6]   SCI Greene is a "close-security" institution.

http://www.cor.state.pa.us/greene/site/default.asp

or 2) it can arise from the law of the state.  <u>Asquith v. Department of Corrections</u>, 186 F.3d 407, 408 (3d Cir. 1999) ("A protected liberty interest may arise from only one of two sources: the Due Process Clause or the laws of a state.").

There is no liberty interest created directly by the Fourteenth Amendment that requires or permits an inmate to be placed in and/or to remain in the general population of a jail.  <u>See</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983);  <u>Meachum v. Fano</u>, 427 U.S. 215, 223-227 (1976); <u>Stephany v. Wagner</u>, 835 F.2d 497, 499 (3d Cir. 1987)("the Due Process Clause does not give a prisoner a liberty interest in remaining in the general prison population").  Thus, Plaintiff has no liberty interest arising directly from the Due Process clause that prevents his placement in AC status.  Hence, the only other source of a liberty interest could arise from state law.

Addressing the issue of state created liberty interests, the United States Supreme Court in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995) held that a state government "may under certain circumstances create liberty interests which are protected by the Due Process Clause.  But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life."
515 U.S. at 483.

Defendants, in their motions to dismiss, pointed out that
spending merely ten months in administrative custody status does
not constitute a deprivation of a liberty interest because it
does not impose an atypical and significant hardship on Plaintiff
in relation to the ordinary incidents of prison life.  This court
agrees.  See, e.g., Griffin v. Vaughn, 112 F.3d 703 (3d Cir.
1997) (confinement in administrative custody for 15 months did
not amount to an atypical and significant hardship); Acosta v.
McGrady, No. Civ. A. 96-2874, 1999 WL 158471 (E.D. Pa. March 22,
1999) (disciplinary confinement in the RHU from April 1994 until
June 11, 1995 was not an atypical and significant hardship);
Smith v. Luciani, No. Civ. A. 97-3037 & 97-3613, 1998 WL 151803,
*5 (E.D.Pa. March 31, 1998) ("In this case, plaintiff was
subjected to seven months disciplinary time, a period of time
half of that implicated in *Griffin*.   Therefore, punishment of
seven months in administrative custody, does not present 'the
type of atypical, significant deprivation [in the context of
prison life] in which a state might conceivably create a liberty
interest.'").

However, even if spending time in AC status with all of the
conditions Plaintiff alleges in his complaint could be said to
constitute an atypical and significant hardship in relation to

the ordinary incidents of prison life, such deprivation was not accomplished without procedural protections given that he received 30 day reviews provided for in the DOC regulations. Shoats, 213 F.3d 145-46 (finding that the DOC's procedures concerning AC status provided sufficient notice and opportunity to be heard).

For the first time, Plaintiff claims, in his responsive brief, that the those 30 day reviews by the PRC would have been perfunctory, even though he did not attend them after the one held on May 29, 2003.  However, Plaintiff cannot avoid attending those hearings and then complain that the opportunity provided to him to be heard by those very hearings concerning his continued AC status would, according to his surmise, be merely perfunctory. Cf. Fatir v. Dowdy, NO. CIV.A. 95-677-GMS, 2002 WL 2018824, *14 (D.Del. Sept. 4, 2002) ("as a matter of policy, it makes little sense to find substantial compliance where an inmate simply assumes that a claim is not redressable through the grievance procedure, without waiting for the grievance board or other prison officials to inform him or her that the complaint is indeed not redressable.  To hold otherwise would permit inmates to satisfy exhaustion requirements based solely upon their own beliefs regarding prison procedures. Obviously, that is an unworkable solution, both for the prisons and the courts.").

Furthermore, even if Plaintiff's allegation of perfunctory

11

PRC hearings were contained in the complaint, as opposed to in his responsive brief, this court would not have to accept the allegation as true because it is affirmatively contradicted by the records attached to his complaint.  Rozsa v. May Davis Group, Inc., 187 F.Supp.2d at 128-29.  So diligent was the PRC committee that it actually sought out Plaintiff who had refused to attend the hearings between June and December 2003 and, on December 2, 2003, the PRC committee went to Plaintiff's cell to interview him in person.  Doc. 41 Ex. E at unn. 22.  After their visitation with him in his cell on December 2, 2003, the PRC committee provided to him a written summary of their decision to continue him in AC status. In their summary of reasons for their action of maintaining Plaintiff in AC status, the PRC committee wrote that they reviewed Plaintiff's record of cumulative adjustment to incarceration and found "a history that contains numerous instances of serious misconduct behavior.  He is deemed to be unacceptable for housing in a Level-3 Medium Security Institution.  He will remain in Administrative Custody Status, in accordance with DC-ADM 802."  Id.

Morever, even if we assume for the sake of argument that the first level hearings were defective, Plaintiff was given the opportunity to appeal his AC status and he did so and his appeals were rejected.  These additional procedural protections also independently satisfy requirements of procedural due process.

This is true, notwithstanding that Plaintiff claims that his
first level appeal to Superintendent Sobina went unanswered and
that his efforts to appeal and/or file grievances were allegedly
stymied, see Doc. 68 at 8, because the documents attached to his
amended complaint establish that his ultimate appeal to the
Central Office was responded to and this final appeal provided
him an opportunity to be heard.  Thus even if the 30 day PRC
reviews were perfunctory, and did not satisfy due process, and/or
the first level appeal was not responded to, he was nevertheless
permitted to appeal those determinations to the final level and
the process of appealing his AC status also satisfies the
opportunity to be heard, and therefore, satisfies due process.
See, e.g., Wilkinson v. Austin, __ U.S. __, 125 S.Ct. 2384, 2396
(2005) (no procedural due process violation in placing a prisoner
in a supermax facility where "Ohio provides multiple levels of
review for any decision recommending OSP placement, with power to
overturn the recommendation at each level. In addition to these
safeguards, Ohio further reduces the risk of erroneous placement
by providing for a placement review within 30 days of an inmate's
initial assignment to OSP."); Wycoff v. Nichols, 94 F.3d 1187,
1189 (8th Cir. 1996)(no due process violation where initial
hearing was defective because the appeal process "constituted
part of the due process Wycoff received, and it cured the alleged
due process violation based on the ISP disciplinary committee's

13

initial decision to sanction Wycoff."). Here, there is no allegation that the final appeal level Plaintiff engaged in was perfunctory and any such contention would be affirmatively refuted by the documents Plaintiff attached to his amended complaint.

Hence, Plaintiff's procedural due process claim fails for either of two independent reasons: 1) he was not deprived of a liberty interest because being maintained in AC status for 10 months is not atypical and significant and 2) even if deprived of a liberty interest, such deprivation was accomplished with adequate procedural safeguards. Accordingly, Count I of Plaintiff's amended complaint, which raised his procedural due process claims, should be dismissed for failure to state a claim upon which relief can be granted.

### 2.  **Plaintiff's State Law Contract Claim**

Plaintiff's state law contract claim fails because under state law, the SMU policy and procedures contained in DOC's regulations[7] do not constitute a contract as a matter of law. See, e.g., Oatess v. Beard, 576 A.2d 398, 400 (Pa.Super. 1990) ("Appellant, as an inmate, did not 'accept' an offer from the SCI

---

[7]  In his amended complaint Plaintiff claimed that "[t]he SMU program Agreement, constitutes a bilateral contract between Plaintiff and the Pennsylvania Department of Corrections under Pennsylvania law. . . .  By the terms of the offer, successful completion of the program was to result in Plaintiff's transfer to general prison population."  Doc. 41 at ¶ 56.

and there was no 'meeting of the minds' upon the terms of the
handbook. The handbook contains administrative directives
concerning aspects of prison life and entitlements of prisoners.
The fact that legal labels are not approved items under the above
quoted section of the handbook does not constitute a breach of
contract. The administrative office of corrections is free to
disallow certain requests made by inmates for items such as legal
labels, and if circumstances require revision of the handbook or
of the list of approved items, the corrections office may freely
do so.")(footnote omitted). See also Semenchuk v. Mansfield
Correctional Inst., 2003 WL 21802271, *2 (Ohio Ct.Cl., July 30,
2003)("the relationship between an inmate and the Department of
Rehabilitation and Correction is custodial, not contractual.").
Moreover, as the language of the SMU policy clearly points out it
was not the intention of DOC to enter into a contract with
Plaintiff when he was sent to the SMU program as DOC did not
agree to provide any rights to Plaintiff via the program, as the
language of the "contract", the very "contract" that Plaintiff
relies upon, states clearly that "[t]his policy sets out policy
and procedure.  It does not create rights in any person . . . ."
Doc. 41, Ex. A at unn. 10.  Hence, DOC did not intend to enter
into any agreement with Plaintiff that provided him any rights
and, as a matter of law, it did not enter into a contract with
him.  Hence, this state law contract claim should be dismissed.

15

### 3. Count III – Eighth Amendment Violation

Next, Plaintiff raises Eighth Amendment deliberate indifference claims.  He alleges that while in SCI-Somerset, he suffered from diabetes, high blood pressure, hyertension, renal damage, imploding type headaches and what Plaintiff claims is his "rare skin disease" known as "Keretosis [sic] Pilaris."[8]  Doc. 41 at ¶ 42.  Plaintiff also alleges that although he was prescribed an American Diabetes Association ("ADA") diet to control his diabetes, he was denied the diet.  In addition, Plaintiff alleges that he has a foreign object in his eye due to a botched prior surgery, which Defendants allow to remain in the eye.  He also claims that while in the AC status at SCI-Somerset, his cell was cold and he was not provided with adequate clothing or balnkets.

The court finds that all of Plaintiff's claims but one, state a claim upon which relief can be granted and therefore recommends denying the Defendants' motions to dismiss as to Count III of the complaint.

The sole allegation that should be dismissed is Plaintiff's claim that he was denied Keri lotion for his skin condition,

---

[8] Keratosis pilaris is defined as "a common skin condition in which keratin, a protein in the skin, forms hard plugs within hair follicles."  See

http://www.nlm.nih.gov/medlineplus/ency/article/001462.htm (Site last visited Dec. 2, 2005).

which Plaintiff contends was ordered by a doctor who directed that Keri was a medically necessary brand.  Essentially Plaintiff complains that he was not given Keri Lotion.  The documents attached to his complaint and incorporated by reference clearly indicate that he was provided some lotion for his skin condition. Doc. 41, Ex. F at unn. 2 (notation that dry skin lotion renewed for 180 days as of 10/6/03); at unn. 13 (Plaintiff Request to Staff dated 12/19/03 wherein he notes that "when the nurse refilled the order, she inadvertently failed to specify the Brand was medically necessary and now [I] am not receiving it [i.e., the Keri lotion] as prescribed but a generic brand substitute which is ineffective treatment for my condition.").  In fact, the documents of record seem to indicate that Plaintiff was receiving Keri lotion but apparently Plaintiff did not believe what he was receiving was in fact Keri lotion.  See id. at unn. 14 (grievance response wherein Healthcare Administrator wrote that "you were receiving Keri lotion and you began to refuse to accept it.  I spoke with nursing staff who stated that they even took the container over to you to show you that the lotion you were receiving was the brand name.  Since you continued to refuse the lotion, a Physician's Assistant discontinued the order. . . . You will receive the lotion as soon as you start to accept it.").  Even assuming that Plaintiff is correct that he was given a generic substitute, disagreement over which drugs to administer

17

simply does not demonstrate the deliberate indifference necessary to state an Eighth Amendment claim. See, e.g., Meeks v. Shuman, No. 95 C 3010, 1997 WL 12790, *8 (N.D.Ill. Jan. 10, 1997) ("substitution of a generic drug for a name-brand drug does not amount to a violation of the Eighth Amendment"). This is true even if part of the motivation in providing him a generic drug was cost containment, assuming that, in fact, he actually received a generic substitute. See Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999)("it is difficult to generalize, except to observe that the civilized minimum is a function both of objective need [for the particular test or treatment] and of cost. The lower the cost, the less need has to be shown, but the need must still be shown to be substantial.").  That cost is a factor in the provision of treatment outside the prison walls supports this conclusion. Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference even if a prisoner does not receive the most costly treatments or his treatment of choice.  Accordingly, any Eighth Amendment claims based on the failure to provide Keri Lotion should be dismissed.

### 4.  Count IV - Retaliation Claims

Plaintiff claims that the defendants retaliated against him for the exercise of his First Amendment rights.  Specifically, he claims that somehow all of the Defendants are retaliating against him because he wrote a letter to the Pennsylvania Bureau

18

of Professional and Occupational Affairs complaining about
Defendant Rush and/or because he has complained about prison
officials countermanding physician ordered treatment.  Doc. 41 at
¶¶ 61-63 and Doc. 28 at ¶ 5 (which is incorporated by reference
into the Complaint, see Doc. 41 at ¶ 60).  The court finds that
these allegations, st this stage of the proceedings,  are
sufficient to state a First Amendment claim of retaliation.

   **5.  Count V - International Law Claims**

   Plaintiff's Fifth Count alleges that the actions of the
Defendants violate his rights under the International Covenant on
Civil and Political Rights as well as under the Convention
Against Torture.  As the Defendants point out these treaties are
not self executing and therefore provide no private right of
action.  The court agrees. <u>See</u>, <u>e.g.</u>, <u>Ralk v. Lincoln County,
Georgia</u>, 81 F.Supp.2d 1372 (S.D. Ga. 2000).

   In <u>Ralk</u>, a pretrial detainee claimed that the conditions of
his detention violated his rights under the International
Covenant.  The court rejected the claim by recounting the history
of the ratification of the International Covenant by the United
States, explaining that the International Covenant is not self
executing:

      The United States signed the ICCPR in 1977, but
   the President did not ratify it until after the Senate
   consented in 1992. See John Quigley, The International
   Covenant on Civil and Political Rights and the
   Supremacy Clause, 42 DEPAUL L. REV. 1287, 1289 (1993).
   When the Senate offered its advice and consent, it did
   so under the declaration "[t]hat the United States
   declares that the provisions of Articles 1 through 27

of the Covenant are not self-executing." 138 Cong. Rec.
§4781-01, §4784 (April 2, 1992). This declaration is
identical to the one posited by President Bush when he
proposed numerous conditions to the Senate Committee on
Foreign Relations. See Senate Committee on Foreign
Relations Report on the International Covenant on Civil
and Political Rights, 31 I.L.M. 645, 652 (1992)
(stating "The Administration proposed a declaration
stating that Articles 1 through 27 of the Covenant are
not self-executing"). The Bush Administration explained
the "not self-executing" declaration in the following
manner: "The intent is to clarify that the Covenant
will not create a private cause of action in U.S.
courts." Id. at 657.

    It is therefore clear from the Legislative and
Executive materials that neither branch intended the
ICCPR to be self-executing. See generally, David Sloss,
The Domestication of International Human Rights;
Non-Self-Executing Declarations and Human Rights
Treaties, 24 YALE.J.INT'L.L. 129 (1999) (exploring in
excellent detail the meaning of "not self-executing"
limitations in several major international human rights
treaties).

Ralk, 81 F.Supp.2d at 1379080.  "'Non-self-executing' means that

absent any further actions by the Congress to incorporate them

[i.e., articles of treaties] into domestic law, the courts may

not enforce them."  Jama v. I.N.S., 22 F.Supp.2d 353, 365 (D.N.J.

1998).  In addition to the courts in Ralk and Jama, other courts

likewise have recognized that the International Covenant is not

self executing and therefore provides no private cause of action

in the Courts of the United States.  See, e.g., Igartua De La

Rosa v. United States, 32 F.3d 8, 10 n. 1 (1st Cir. 1994)

("Articles 1 through 27 of the Covenant were not self-executing,

and could not therefore give rise to privately enforceable rights

under United States law.")(citation omitted);  Beazley v.

<u>Johnson</u>, 242 F.3d 248, 267 (5th Cir. 2001)("the treaty is not self-executing.").

This same reasoning applies equally to the Convention on Torture. <u>See</u>, <u>e.g.</u>, <u>Raffington v. Cangemi</u>, 399 F.3d 900, 903 (8th Cir. 2005)(Convention Against Torture was not self executing); <u>Castellano-Chacon v. I.N.S.</u>, 341 F.3d 533, 551 (6th Cir. 2003)(same); <u>Calderon v. Reno</u>, 39 F.Supp.2d 943 (N.D. Ill. 1998). Hence, all claims in Count V should be dismissed.

**CONCLUSION**

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

<u>/s/Lisa Pupo Lenihan</u>
Lisa Pupo Lenihan
U.S. Magistrate Judge

Dated: Dec. 5, 2005

```
cc:  The Honorable Kim R. Gibson
     United States District Judge

     Bob Brightwell
     AM-5842
     SCI Mahanoy
     301 Morea Road
     Frackville, PA 17932

     Kemal Alexander Mericli
     Office of the Attorney General
     Civil Litigation Section
     564 Forbes Avenue
     6th Floor, Manor Complex
     Pittsburgh, PA 15219
     (412) 565-7680

     Elizabeth M. Yanelli
     Pietragallo, Bosick & Gordon
     One Oxford Centre
     38th Floor
     Pittsburgh, PA 15219
```